## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 19 2020, 6:22 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elizabeth A. Flynn
Braje, Nelson & James, LLP
Michigan City, Indiana

ATTORNEY FOR APPELLEE

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Timothy Malott,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 19, 2020

Court of Appeals Case No.
19A-CR-2620

Appeal from the LaPorte Superior
Court

The Honorable Michael S.
Bergerson, Judge

Trial Court Cause No.
46D01-1810-F4-1114

**Bradford, Chief Judge.**

# Case Summary

On October 5, 2018, Timothy Malott was involved in a deadly automobile collision. The driver of the other vehicle died after his vehicle was struck by Malott's vehicle. Malott was subsequently charged with numerous offenses relating to the collision. Following trial, the trial court entered judgment against Malott for Level 4 felony operating while intoxicated ("OWI") with a prior conviction causing death and Level 5 felony reckless homicide. The trial court sentenced Malott to an aggregate ten-year term of incarceration.

On appeal, Malott contends that (1) the trial court abused its discretion in admitting certain evidence, (2) the evidence is insufficient to prove that he was intoxicated at time of the collision, and (3) his convictions and sentences for both the Level 4 felony OWI offense and Level 5 felony reckless homicide violate Indiana's prohibitions against double jeopardy. Upon review, we conclude that (1) the trial court did not abuse its discretion in admitting the challenged evidence, (2) the evidence is sufficient to prove that Malott was intoxicated at the time of the collision, and (3) Malott's convictions and sentences for both the Level 4 felony OWI offense and Level 5 felony reckless homicide violate Indiana's prohibitions against double jeopardy. As such, we affirm in part, reverse in part, and remand with instructions.

# Facts and Procedural History

[3]     Around 2:45 p.m. on October 5, 2018, Malott's sister drove him to a body shop in Michigan City to pick up his vehicle. Malott then ran a few other errands before ending up at the "Three Sheets Bar" at around 4:45 p.m., where he stayed for about fifteen to twenty minutes. Tr. Vol. V. p. 90. While at the bar, he consumed "two tall draft[]" beers. Tr. Vol. V p. 91.

[4]     At approximately 5:00 p.m., just prior to the collision, Malott was stopped at the intersection of Franklin Street and Barker Street near downtown Michigan City, headed southbound on Franklin Street in the left-hand lane. Vehicles driven by Andrea Garrett and David Johnson were stopped in the lane adjacent to Malott's vehicle. When the light turned green, Garrett's and Johnson's vehicles began moving, but Malott's did not. After a few moments, Malott revved his engine, "squealed his tires and, like, took off really fast and jetted past [Garrett]." Tr. Vol. II p. 242. Malott was driving "much faster" than both Garrett and Johnson, and neither Garrett nor Johnson noticed any other vehicle behind Malott also driving fast. Tr. Vol. II p. 243.

[5]     A few blocks to the south, Anthony Waters was stopped at the intersection of Franklin Street and Skwiat Legion Avenue. As Waters pulled out to make a left turn into the northbound lanes of Franklin Street, his vehicle was struck by Malott's vehicle. Garrett described the collision, stating that Malott "crashed into him. He T-boned him." Tr. Vol. II p. 242. Waters had to be extracted from his vehicle and died shortly thereafter from "multiple blunt force trauma" that was "the result of injuries from" the collision. Tr. Vol. III p. 217.

[6] Michigan City Police Captain Jeff Loniewski arrived on the scene within a minute or two of the crash. Captain Loniewski described the collision as "so violent that it actually pushed the entire driver's compartment laterally, sideways over into the passenger compartment" making it appear as if "the driver was the passenger, the front seat passenger." Tr. Vol. III p. 33. Captain Loniewski found Malott "seated in the driver's seat" of his vehicle "with the door open." Tr. Vol. III p. 21. Malott told Captain Loniewski that he "was traveling southbound on Franklin Street in the right hand lane and that he tried -- was attempting to pass a vehicle that was slower ahead of him, so he moved to the left lane and at that point [Waters] pulled out in front of him." Tr. Vol. III p. 22. Captain Loniewski observed that Malott "was staring straight ahead when [he] asked him questions and even when he responded to [Captain Loniewski's] questions, he continued staring straight ahead as if he was trying to avoid making eye contact" with Captain Loniewski. Tr. Vol. III p. 22.

[7] Malott initially consented to submit to a chemical test, so Michigan City Police Lieutenant Greg Jesse transported him to the hospital. Lieutenant Jesse noticed a faint "sweet, almost chemical like smell" that Lieutenant Jesse recognized as smelling similar to some forms of alcohol when Malott was in his vehicle. Vol. III p. 173. Lieutenant Jesse also noticed that Malott slightly dragged one foot sometimes when walking. Once at the hospital, Malott refused to submit to a blood test without consulting with his attorney because he was being "railroaded." Tr. Vol. III p. 178. Given Malott's refusal to submit to the test,

Lieutenant Jesse transported Malott to the police station and began the process of obtaining a search warrant.

[8] The search warrant was issued at approximately 8:45 p.m., after which Michigan City Police Sergeant Jason Holaway took Malott back to the hospital for the administration of the test. Malott's blood was drawn at 9:28 p.m., approximately four hours and twenty minutes after the collision. The test results subsequently showed that Malott's blood alcohol content ("BAC") was .108 plus or minus .008 grams per 100 milliliters.

[9] It was subsequently determined that at the time of the collision, Malott was traveling approximately sixty-eight miles per hour, well above the posted thirty-miles-per-hour speed limit. The subsequent examination of the black box from Malott's vehicle showed that his accelerator pedal was still at 100% activation four seconds before impact and did not reach 0% activation until 1.5 seconds before impact. His vehicle's speed continued to increase until two seconds before impact, when he was traveling at 74.6 miles per hour. A half-second before impact, Malott was still traveling at 72.7 miles per hour, and at the moment of impact he was traveling at 68.3 miles per hour. There was no activation of the brakes until within a half-second before impact.

[10] On October 9, 2018, the State charged Malott with Count I – Level 5 felony operating a vehicle with a BAC of .08 or greater causing death, Count II – Level 5 felony OWI causing death, Count III – Level 4 felony operating a vehicle with a BAC of .08 or greater with a prior conviction causing death, and

Count IV – Level 4 felony OWI with a prior conviction causing death. On February 11, 2019, the State amended the charging information to add Count V – Level 5 felony reckless homicide. A jury trial was held on August 13–16, 2019, at the conclusion of which the jury found Malott guilty of Counts I, II, and V. Malott subsequently pled guilty to Counts III and IV. On October 17, 2019, the trial court entered judgment of conviction on Count IV and Count V.

[11] In sentencing Malott, the trial court stated as follows:

> At trial, the Defendant concocted a story about being involved in a road rage incident as the reason for his excessive speed on the most traveled street in Michigan City; especially on an early Friday evening. Had such an incident actually occurred, surely the Defendant would have mentioned same to the investigating police officers at the scene of the collision or at some point later in the course of the investigation. However, the Defendant never mentioned this critical piece of information at all during the course of his multiple opportunities to do so while his blood work was being taken and analyzed.
>
> The most compelling evidence is that the Defendant was intoxicated at the time of the accident; that he was driving at excessive speed and that each of said factors individually and/or in combination with the other caused the collision that resulted in the death of Anthony Waters.

Appellant's App. Vol. III p. 118. The trial court merged the convictions for Counts I through III with Count IV and imposed a ten-year term of imprisonment. The trial court also imposed a five-year term of imprisonment for the reckless homicide conviction. The trial court ordered that the sentences "shall be served concurrently," recommended placement in "the Recovery

While Incarcerated Program," and indicated that Malott "shall be entitled to file a Petition to Modify after having completed said program and after serving at least 5 actual years of said sentence." Appellant's App. Vol. III p. 120.

# Discussion and Decision

Malott challenges his conviction for Level 4 felony OWI with a prior conviction causing death, claiming that the trial court abused its discretion in admitting certain evidence and that the evidence is insufficient to sustain his conviction. Malott also contends that his convictions and sentences for both the Level 4 felony OWI offense and Level 5 reckless homicide violate the prohibitions against double jeopardy.

# I. Admission of Evidence

Malott contends that the trial court abused its discretion in admitting certain evidence at trial.

> The admission or exclusion of evidence is entrusted to the discretion of the trial court. We will reverse a trial court's decision only for an abuse of discretion. We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law.

*Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012) (internal citations omitted). "Moreover, the trial court's ruling will be upheld if it is sustainable

on any legal theory supported by the record, even if the trial court did not use that theory." *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008) (citing *Gonser v. State*, 843 N.E.2d 947, 950 (Ind. Ct. App. 2006)).

[14] Indiana Evidence Rule 702(a) provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Dr. Shelia Arnold, the Forensic Toxicologist and Quality Control Coordinator for the Indiana State Department of Toxicology, testified at Malott's trial regarding the results from the blood test taken approximately four hours and twenty minutes after the collision and gave an opinion as to what range Malott's BAC would have been in at the time of the collision. Malott does not dispute that Dr. Arnold was qualified as an expert and did not object to Dr. Arnold's testimony regarding the results of the blood test. Malott, however, challenges the admission of Dr. Arnold's testimony regarding her opinion of what range Malott's BAC would have been in at the time of the collision.

[15] Dr. Arnold testified that she could estimate a range for Malott's BAC at the time of the collision using the theory of retrograde extrapolation. The trial court allowed this testimony over Malott's objection. In challenging the admission of Dr. Arnold's testimony, Malott argues as follows:

> Dr. Arnold's testimony regarding the retrograde range, because of its lack of reliability, does not help the jury but, instead,

exposed the jury to information that had the potential of being unfairly prejudicial and confusing. Dr. Arnold was allowed to opine that Malott's BAC was between .151 and .216 despite conceding that she could not definitively say what his actual BAC level was and could further not say he was not below a .08 at the time of the accident. She could not say he was not in the absorption phase.

Appellant's Br. p. 25. For its part, the State argues that "[r]etrograde extrapolation evidence has long been deemed admissible; in fact, whenever the State is operating outside the statutory presumption window, the State must present retrograde extrapolation evidence to prove a charged" offense. Appellee's Br. p. 20. We agree with the State.

[16] Indiana Code section 9-30-6-15(b) provides that if a chemical test is administered within three hours of when the individual is suspected to have driven under the influence, the results, if showing the individual to have a BAC of .08 or above, create a rebuttable presumption that the individual was driving with a BAC of .08 or above. "The only effect of the failure to perform the test within the statutory timeframe is that the State is deprived of the rebuttable presumption provided in Section 15(b)." *State v. Stamm*, 616 N.E.2d 377, 380 (Ind. Ct. App. 1993). "[T]he delay is relevant only to the rebuttable presumption, not the admissibility of the chemical test." *Id.* Thus, if the test was taken more than three hours after the person is suspected to have driven under the influence, the State may not rely solely on the test results but must provide extrapolation evidence relating the driver's BAC to the time of the incident. *See Mannix v. State*, 54 N.E.3d 1002, 1009 (Ind. Ct. App. 2016)

(providing that because Mannix's blood was drawn more than three hours after the accident, the State was deprived of the rebuttable presumption in Section 9-30-6-15(b) and therefore must have provided extrapolation evidence relating Mannix's BAC at the time of the test back to the time of the accident); *Stamm*, 616 N.E.2d at 380 (providing that test results taken more than three hours after an individual is alleged to having driven under the influence may be used to determine the precise BAC of the defendant at the time of the accident if the State produces additional evidence of such BAC by means of extrapolation).

[17] Malott asserts that Dr. Arnold's opinion testimony as to the potential range of his BAC at the time of the collision should have been excluded because the potential probative value of the opinion was substantially outweighed by the danger of unfair prejudice and confusion of the issues. *See* Ind. Evid. Rule 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."). In arguing that he was prejudiced by the admission of the challenged evidence, Malott asserts as follows:

> No amount of cross-examination can erase these numbers from a jury's mind when coming from an individual identified as having a high level of expertise in the field. The expectation that a jury filled with lay persons would discount Dr. Arnold's opinion, on an issue as complex and detailed as retrograde extrapolation, is simply too far farfetched no matter how effective the cross-examination may have been. Dr. Arnold's opinion on the extrapolation issue substantially prejudiced Malott's ability for a fair trial.

Appellant's Br. p. 23. For its part, the State asserts that Malott's arguments "go only to the weight of the evidence, not to its admissibility, and they do not show that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice." Appellee's Br. p. 22. Again, we agree with the State.

[18] In testifying about how retrograde extrapolation works and its limitations, Dr. Arnold acknowledged that there are several factors that can affect absorption and elimination rates and that people will absorb and eliminate alcohol at different rates. She testified that the general consensus is that on average, a person's body absorbs alcohol for "somewhere between 30 minutes and an hour" after their last drink. Tr. Vol. IV p. 84. However, "looking backwards, there's no way" for her to precisely identify Malott's alcohol absorption rate. Tr. Vol. IV p. 84. She further testified that she relies on ranges in completing retrograde extrapolation analysis because she's "not going to assume somebody's average … science shows that you can be lower or you can be higher. So I'm going to always present that as possibilities, because it is a possibility." Tr. Vol. IV p. 87. Dr. Arnold further acknowledged that not everyone agrees that retrograde extrapolation is "a good type of methodology to be used in criminal prosecutions," especially when "people use averages and assume someone is that average as opposed to taking the low and high range of what has been reported in the literature the way that I approach it." Tr. Vol. IV p. 131. The State accurately states that "[t]he jury was fully apprised of the factors that may influence these rates and of the information that was unknown

to Dr. Arnold and thus prevented her from calculating a definitive BAC at the time of the crash." Appellee's Br. p. 23. As such, we agree with the State that "[i]t was for the jury to decide, given this information, how much weight to place on the fact that Defendant had a .108 BAC a little over four hours after the crash and how much weight to place on Dr. Arnold's expert opinion regarding Defendant's likely BAC at the time of the crash." Appellee's Br. p. 23. The trial court, therefore, did not abuse its discretion in admitting the challenged evidence.

## II. Sufficiency of the Evidence[1]

[19]   Malott also contends that the evidence is insufficient to sustain his conviction for Level 4 felony OWI with a prior conviction causing death. Our standard of review for challenges to the sufficiency of the evidence is well-settled. *Bell v. State*, 31 N.E.3d 495, 499 (Ind. 2015). "We do not reweigh the evidence or assess the credibility of witnesses in reviewing a sufficiency of the evidence claim." *Id.* Conflicting evidence is considered "in the light most favorable to the trial court's finding." *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). This is because the factfinder, and not the appellate court, "is obliged to determine not only whom to believe, but also what portions of conflicting testimony to

---

[1] The State argues that Malott waived his challenge to the sufficiency of the evidence by pleading guilty. However, review of the record reveals that while Malott did plead guilty to the enhancement of his OWI conviction from a Level 5 felony to a Level 4 felony due to a prior OWI conviction, Malott only stipulated that he had been convicted of an unrelated OWI offense within five years of committing the instant OWI offense and explicitly retained his right to challenge the sufficiency of the evidence of the underlying OWI charge.

believe, and is not required to believe a witness's testimony even when it is uncontradicted." *Perry v. State*, 78 N.E.3d 1, 8 (Ind. Ct. App. 2017) (internal quotation and brackets omitted). On appeal, we "look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable fact-finder could have found the defendant guilty beyond a reasonable doubt." *Bell*, 31 N.E.3d at 499.

[20] At the time of the collision, Indiana Code section 9-30-5-5(a)(3) provided that a person who caused the death of another person when operating a vehicle while intoxicated committed a Level 5 felony. However, "a person who cause[d] the death of another person when operating a vehicle … commit[ed] a Level 4 felony if: (1) the person operating the vehicle ha[d] a previous conviction of operating while intoxicated within the ten (10) years preceding the commission of the offense[.]" Ind. Code § 9-30-5-5(b)(1). It is undisputed that Waters was killed in the collision with Malott and that Malott had a prior OWI conviction within the five years preceding the collision. In challenging his conviction, Malott argues only that the evidence is insufficient to prove that he was intoxicated at the time of the collision.

[21] "'Intoxicated' means under the influence of: (1) alcohol … so that there is an impaired condition of thought and action and the loss of normal control of a person's faculties." Ind. Code § 9-13-2-86. "[P]roof of intoxication may be established by showing impairment, and … does not require proof of a [BAC] level." *Ballinger v. State*, 717 N.E.2d 939, 943 (Ind. Ct. App. 1999). "Evidence

of the following can establish impairment: (1) the consumption of significant amounts of alcohol; (2) impaired attention and reflexes; (3) watery or bloodshot eyes; (4) the odor of alcohol on the breath; (5) unsteady balance; (6) failure of field sobriety tests; (7) slurred speech." *Id.* However, a person need not exhibit signs of both physical and cognitive impairment as impairment of either creates a considerable danger to others. *See Curtis v. State*, 937 N.E.2d 868, 873 (Ind. Ct. App. 2010) (providing that a person who displays signs of cognitive impairment but control of his physical movements is as much of a danger as a person who is unable to control his physical movements but has cognitive lucidity). "It is perhaps for this reason that our courts have consistently" held that impairment need not be proven by element-by-element fashion but rather can be "established by evidence of certain behaviors and traits evincing impairment, irrespective of whether that evidence established particularized impairment of action, and impairment of thought, and loss of control of faculties." *Id.* "Circumstantial evidence is sufficient to prove that the defendant operated the vehicle while intoxicated." *Jellison v. State*, 656 N.E.2d 532, 535 (Ind. Ct. App. 1995).

[22] At trial, Malott admitted that he arrived at the "Three Sheets Bar" at around 4:45 p.m. and stayed for about fifteen to twenty minutes. Tr. Vol. V. p. 90. He further admitted that while at the bar, he consumed "two tall draft[]" beers. Tr. Vol. V p. 91. A reasonable person could infer that drinking two tall draft beers in such a short time span could impair one's mental faculties. *See generally Jellison*, 656 N.E.2d at 535 (providing that evidence that the defendant had

consumed alcohol in the hours preceding a traffic accident could support an inference of impairment).

[23] In addition to Malott's own testimony, the State's evidence regarding Malott's alcohol consumption supports the inference that Malott was impaired at the time of the collision. Malott avoided direct eye contact and turned his head to avoid speaking directly at investigating officers. He also provided differing explanations for his actions immediately preceding the collision. Further, while Malott's BAC at the time of the collision is unknown, four hours and twenty minutes after the collision, his BAC was .108. Although the test was conducted more than three hours after the collision, the results, which show that Malott had alcohol in his system, are admissible to support the OWI charge. *See Stamm*, 616 N.E.2d at 380. This is especially true given that there is nothing in the record that would suggest that Malott consumed any alcohol in the time that passed between the time of the collision and testing, supporting the inference that all alcohol in his system at the time of testing was present in his system at the time of the collision. In addition, Dr. Arnold testified that for Malott's BAC to be .108 four hours and twenty minutes after the collision, he would have had to have consumed at least "between 6.1 and 9 standard drinks," depending on the rate at which his body absorbed alcohol. Tr. Vol. IV p. 117. Dr. Arnold also testified that impairment generally begins when a BAC is .04 or .05. A reasonable person could infer from the State's evidence regarding Malott's alcohol consumption that Malott was intoxicated at the time of the collision.

In challenging the sufficiency of the evidence to prove intoxication, Malott essentially requests that we disregard the BAC evidence and Dr. Arnold's testimony and instead credit his self-serving testimony that he was not intoxicated. Malott's challenge to the sufficiency of the evidence amounts to nothing more than an invitation to reweigh the evidence and reassess witness credibility, which we will not do. *Bell*, 31 N.E.3d at 499. Furthermore, while we acknowledge that evidence of erratic or reckless driving can, under some circumstances, be a sign of intoxication, *see Boyd v. State*, 519 N.E.2d 182, 184 (Ind. Ct. App. 1988) and *Hughes v. State*, 481 N.E.2d 135, 137 (Ind. Ct. App. 1985) (providing that the factfinders could infer impairment from the defendants' acts of driving well above the posted speed limit at night and dusk, respectively, especially when coupled with other visible signs of the defendants' intoxication), in this case, we conclude that the jury was provided with sufficient evidence unrelated to Malott's driving from which it could find that Malott was intoxicated.

## III. Double Jeopardy

Finally, Malott claims, and the State concedes, that because the collision resulted in the death of only one person, prohibitions against double jeopardy prohibit Malott from being punished for both Level 5 felony reckless homicide and Level 4 felony OWI with a prior conviction causing death. Malott argues that we should eliminate the double jeopardy violation by reducing "the OWI death conviction, as a level 4 Felony, to an OWI with a prior conviction … as a

Level 6 Felony." Appellant's Br. p. 21. For its part, the State argues that we should eliminate the violation by vacating the reckless homicide conviction.

## A. Overview of Cases Discussing OWI Causing Death and Reckless Homicide

### 1. Carter, Drossos, and Marshall

[26] In *Carter v. State*, 424 N.E.2d 1047 (Ind. Ct. App. 1981), Carter was convicted of both OWI causing death and reckless homicide. The evidence at trial established that Carter was intoxicated at the time of the incident and "[t]hat coupled with the apparent speed and manner in which the vehicle swerved off both sides of the road prior to striking the tree would support the inference of recklessness." *Carter*, 424 N.E.2d at 1048. On appeal, we concluded that Carter could not be convicted of both OWI causing death and reckless homicide. *Id.* In explaining our conclusion, we stated the following:

> There was here but one homicide, and that was the gravamen of the offense. It matters no more that Carter was both intoxicated and driving recklessly in causing his passenger's death than it would have had Carter poisoned him, stabbed him and thrown him from a high bridge. The means of committing an offense may not be utilized to multiply the number of offenses committed. Only one homicide was committed and only one sentence may be imposed.
>
> The case is therefore remanded to the trial court with instructions to vacate one of the sentences.

*Id.* (internal citations omitted).

[27]  We reached the same conclusion in *Drossos v. State*, 442 N.E.2d 1 (Ind. Ct. App. 1982). In that case, Drossos was involved in an accident in which four people were killed. *Drossos*, 442 N.E.2d at 2. Evidence established that at the time of the accident, Drossos was both driving recklessly and intoxicated. *Id.* at 2–3. Just prior to the accident, Drossos had been tailgating another vehicle and driving aggressively, and he was traveling at a rate of speed above the posted speed limit when he collided with the other vehicle. *Id.* at 2. Officers administered a breathalizer test, which subsequently revealed that, at the time of the collision, Drossos's BAC was .17. *Id.* at 3. Drossos was charged in relation to the death of the other driver and two of the other driver's passengers, with one count of reckless homicide and one count of OWI causing death for each individual. *Id.* He was subsequently convicted of all six charges. *Id.*

[28]  On appeal, we noted that Drossos was convicted twice for killing each victim. *Id.* at 6. Citing to *Carter*, we concluded that "[i]n a case such as this, there was but one homicide of each victim and evidence can support but one conviction." *Id.* We affirmed Drossos's convictions for OWI causing death and remanded the matter to the trial court with instructions to vacate the three reckless homicide convictions. *Id.* at 6–7.

[29]  We also reached the same conclusion in *Marshall v. State*, 563 N.E.2d 1341 (Ind. Ct. App. 1990). In this case, Marshall lost control of his vehicle while driving, killing six passengers. *Marshall*, 563 N.E.2d at 1342. At the time of the accident, Marshall's BAC was .12. *Id.* Marshall was charged with and

convicted of both operating a vehicle with a BAC of .10 causing death and reckless homicide. On appeal, we concluded as follows:

> Marshall cannot be convicted of operating a motor vehicle with a BAC of .10% or more resulting in death and reckless homicide for the death of a single individual. Therefore, the trial court erred in failing to vacate either Marshall's conviction and sentence for the operating offense or the reckless homicide offense based upon the death of the same individual.

*Id.* at 1343. We "remanded with instructions to the trial court to vacate the conviction and sentence for either operating a vehicle with a BAC of .10% or more resulting in death or the conviction and sentence for reckless homicide arising from the death of the same individual." *Id.* at 1344.

## *2.* **Dawson**

[30] In *Dawson v. State*, 612 N.E.2d 580 (Ind. Ct. App. 1993), an individual was killed after being struck by Dawson's motorcycle. After a night of drinking, Dawson arrived at a party at about 2:00 a.m. and decided to entertain or impress his fellow partygoers by riding his motorcycle in a "wheelie" in front of them. *Dawson*, 612 N.E.2d at 582. Tragically, one of Dawson's friends died after being struck by Dawson's motorcycle as the friend "happened to walk or run" into the street. *Id.*

[31] On appeal, we concluded that Dawson could not be punished for both OWI causing death and reckless homicide. However, in reaching this conclusion we stated that unlike in *Carter* and *Drossos*, "[w]e are not convinced Dawson's OWI

death and reckless homicide offenses are the same for double jeopardy

purposes." *Dawson*, 612 N.E.2d at 585. We explained as follows:

> Unlike in *Carter* and *Drossos*, the State's legal theory supporting
> its allegation of reckless homicide against Dawson did not entail
> proof of intoxication. To the contrary, to establish Dawson's
> recklessness the State need have established only that Dawson
> did a wheelie on his motorcycle, since a wheelie by its very
> nature is a reckless act. This the State did. Because the offense
> of reckless homicide was premised on Dawson's wheelie, and not
> on his intoxication, and the offense of OWI death was premised
> on Dawson's intoxication, and not on the fact that he did a
> wheelie, the two offenses are not the same for double jeopardy
> purposes and double jeopardy is not offended by punishing
> Dawson for each.

*Id.* (footnote omitted). We concluded, however, that "[a]lthough double

jeopardy does not forbid Dawson from being punished for both OWI death and

reckless homicide under these facts (*i.e.*, when recklessness is not predicated

upon intoxication), we hold Indiana law does impose such a prohibition." *Id.*

We remanded the case to the trial court with instructions to vacate Dawson's

OWI causing death conviction, enter the lesser-included OWI conviction, and

to sentence Dawson accordingly. *Id.* at 586. Specifically, we stated the

following:

> Because double jeopardy prohibits multiple punishments for the
> same offense, and because *Carter* and *Drossos* were decided on
> double jeopardy grounds, the *Carter* and *Drossos* courts were
> compelled to vacate at least one of the sentences and/or
> convictions in question. Dawson's case, on the other hand,
> raised no constitutional double jeopardy prohibitions;

accordingly, double jeopardy does not require that we vacate one of his convictions and/or sentences. Indiana case law requires only that Dawson not be punished for both OWI death and reckless homicide convictions arising from the same accidental death; it does not forbid Dawson from being punished for, say, reckless homicide and operating a vehicle while intoxicated (OWI), a lesser-included offense of OWI death.

In fact, we find that substituting OWI for OWI death is a satisfactory outcome here…. Because OWI is a lesser-included offense of OWI death, it is plain Dawson was guilty of OWI and was put on notice that he could be punished for it.

*Id.* at 585–86.

## B. The Instant Matter

[32] Malott argues that like in *Dawson*, the convictions were based on distinct facts. Specifically, he claims that the Level 5 felony reckless homicide charge was premised on his reckless behavior and not on his intoxication, and the Level 4 felony OWI with a prior conviction causing death charge was premised on his intoxication and not on the fact that he drove recklessly. We cannot agree.

[33] In *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999), the Indiana Supreme Court concluded that "two or more offenses are the same offense in violation of article 1, section 14 if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to obtain convictions, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Garrett v. State*, 992 N.E.2d 710, 719 (Ind. 2013).

> Under the actual evidence test, we examine the actual evidence presented at trial in order to determine whether each challenged offense was established by separate and distinct facts. To find a double jeopardy violation under this test, we must conclude that there is a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense…. Our precedents instruct that a reasonable possibility that the jury used the same facts to reach two convictions requires substantially more than a logical possibility.

*Id.* at 719 (internal quotations and citations omitted). "The existence of a reasonable possibility turns on a practical assessment of whether the [fact finder] may have latched on to exactly the same facts for both convictions." *Id.* at 720 (brackets in original). "We evaluate the evidence from the jury's perspective and may consider the charging information, jury instructions, and arguments of counsel." *Id.*

[34] While the charging information for the reckless homicide charge does not mention intoxication, like in *Carter*, *Drossos* and *Marshall*, the collision occurred while Malott was operating a vehicle for normal travel on a public roadway. Just prior to the collision, Malott was stopped at the intersection of Franklin Street and Barker Street near downtown Michigan City, headed southbound on Franklin Street in the left-hand lane. Two other vehicles driven by Garrett and Johnson were stopped in the lane adjacent to Malott's vehicle. When the light turned green, Garrett's and Johnson's vehicles began moving, but Malott's did not. After a few moments, Malott revved his engine. Malott then "squealed his

tires and, like, took off really fast and jetted past [Garrett] and um, crashed into a car that was coming, turning onto Franklin. He crashed into him. He T-boned him." Tr. Vol. II p. 242. Although Malott attempted to justify his actions by claiming that another vehicle had tapped his bumper while he was stopped at the traffic light and aggressively followed him at a high rate of speed once the light turned green, neither Garrett nor Johnson observed another vehicle following close to Malott at a high rate of speed. At the time of the collision, Malott was traveling approximately sixty-seven miles per hour, well above the posted thirty-miles-per-hour speed limit. While Malott's BAC at the time of the collision is unknown, approximately four-and-one-half hours after the collision, his BAC was .108 plus or minus .008 grams per 100 milliliters.

[35] Furthermore, in its closing argument to the jury, the State argued that Malott's impairment was a cause of his reckless driving. Specifically, the State asserted:

> What's … impairment? Lack of inhibitions, poor judgment, slow reactions, no reactions, buzzed driving is drunk driving. We've heard that slogan. You're not as quick when you've got six drinks on—board. You're different. You don't have inhibitions. You don't have good judgment. You might decide, assuming someone honks their horn and flips you off, you need to go 75 miles per hour down Franklin Street while looking in the rearview mirror, despite the fact that there's traffic and a bunch of people in front of you. That's impaired judgment. You might be driving 75 miles per hour mostly looking in your rearview mirror, if it's true, because you're not putting together the fact that you really ought to be paying attention where you're going in case somebody's in the road. You might, despite the fact that somebody's in the road, not notice them or not react and even though you're 100 yards away or more, well, if you were sober,

you probably would have been paying attention, you probably would have done something about it, and you wouldn't have been going 75 miles per hour in the first place…. Do we have terrible judgment, impaired judgment, unjustifiable judgment? Do we have lack of inhibitions? Do we have lack of reaction? We do. This seems like an okay idea, this seems like an appropriate response. I don't just drive 35 to 40 miles an hour in a way and go to the police or use my cell phone, because my thinking is impaired, my judgment is impaired, and this seems like a perfectly acceptable thing to do, 75 miles an hour down Franklin. I am exaggerating, it was 74.7 miles per hour. I rounded up. Would a sober person with normal faculties make those decisions and drive like that? Well, if they were being reckless, what's the probable reason that those reckless decisions seemed okay? Impairment.

Tr. Vol. V. pp. 130–31.

[36] Considering the charging information, the evidence relating to the collision, and the State's arguments to the jury, we conclude that the jury could have reasonably inferred that Malott's reckless driving was caused by impairment. The evidence supports an inference that Malott exhibited poor reflexes and judgment, driving in a manner that caused him to collide with Waters's vehicle. As such, we conclude that the facts of the instant matter are more akin to those in *Carter*, *Drossos* and *Marshall* than in *Dawson*. In each of those cases, we remanded the matter with instructions to vacate either the convictions for OWI causing death or reckless homicide. Following the precedent set forth in each of these case, we conclude that the appropriate way to remedy the double jeopardy violation here is to vacate one of Malott's convictions.

[37] "[W]hen we determine that two convictions contravene double jeopardy principles, we may eliminate the violation by vacating either conviction, and we consider the penal consequences that the trial court found appropriate." *Owens v. State*, 742 N.E.2d 538, 545 (Ind. Ct. App. 2001). In this case, the trial court considered the appropriate penal consequences and sentenced Malott to an aggregate ten-year term of imprisonment. Taking the penal consequences imposed by the trial court into account, we vacate the Level 5 felony reckless homicide conviction because it has less severe penal consequences, and we leave standing the Level 4 felony OWI conviction. *See Jenkins v. State*, 726 N.E.2d 268, 271 (Ind. 2000) (vacating the robbery conviction because it has less severe penal consequences than the remaining felony murder conviction); *Owens*, 742 N.E.2d at 545 (vacating the defendant's battery conviction because it had less severe penal consequences that the remaining attempted robbery conviction). On remand, we instruct the trial court to vacate Malott's conviction for Level 5 felony reckless homicide.

[38] The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions.

Baker, J., and Pyle, J., concur.